1  JOHNSON & WEAVER, LLP
   Frank J. Johnson, Esq. (SBN 174882)
2  FrankJ@johnsonandweaver.com
   Phong L. Tran, Esq. (SBN 204961)
3  PhongT@johnsonandweaver.com
   600 West Broadway, Suite 1540
4  San Diego, CA 92101
   Telephone: (619) 230-0063
5  Facsimile: (619) 255-1856

6  *Counsel for Plaintiff*

7

8              **UNITED STATES DISTRICT COURT**

9             **CENTRAL DISTRICT OF CALIFORNIA**

10 | NICK COCCO, Derivatively on Behalf | Case No.: 8:17-cv-01183
   | of ENDOLOGIX, INC., |
11 |                                    | **VERIFIED SHAREHOLDER**
   |             Plaintiff,             | **DERIVATIVE COMPLAINT**
12 |                                    |
   |                v.                  | **JURY TRIAL DEMANDED**
13 |                                    |
   | JOHN MCDERMOTT, VASEEM             |
14 | MAHBOOB, DANIEL LEMAITRE,          |
   | LESLIE NORWALK, GUIDO J.           |
15 | NEELS, CHRISTOPHER G. CHAVEZ,      |
   | GREGORY D. WALLER,                 |
16 | THOMAS C. WILDER, III, and         |
   | THOMAS F. ZENTY, III,              |
17 |                                    |
   |             Defendants,            |
18 |                                    |
   |              -and-                 |
19 |                                    |
   | ENDOLOGIX, INC., a Delaware        |
20 | corporation,                       |
21 |            Nominal Defendant.      |

22

23

24

25

26

27

28

By and through his undersigned counsel, Plaintiff Nick Cocco ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Endologix, Inc. ("Endologix" or the "Company"), and against certain officers and directors of the Company for issuing false and misleading proxy statements in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for breaches of fiduciary duties, unjust enrichment and corporate waste. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Endologix with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, analyst reports, and postings on Endologix's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action, *Nguyen v. Endologix, Inc. et al.*, Case No. 2:17-cv-00017-AB-PLA (C.D. Cal.) (the "Securities Class Action"); and (e) review of other publicly available information concerning Endologix and the Individual Defendants (defined below).

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Endologix that seeks to redress wrongdoing by the Company's board of directors (the "Board") and certain of its senior officers.  From at least April 20, 2016 to the present (the "Relevant Period"), the Individual Defendants breached their fiduciary duties owed to Endologix and its shareholders and committed other violations of law by, *inter alia*, causing the Company to issue materially false and misleading statements and/or omit material information from its public filings and communications with analysts and investors, the disclosure of which would have

2

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

made such filings and communications not misleading.  By and through the Individual Defendants' violations of law, Endologix has sustained and will continue to sustain damages, including hundreds of millions of dollars in losses to the Company's market capitalization, as well as significant harm to its reputation, goodwill, and standing in the business community.  Moreover, the Individual Defendants' wrongdoing has exposed the Company to millions of dollars in potential liability from the Securities Class Action, and the significant costs incurred (and to be incurred) in connection with the litigation and potential resolution of that action.

2.     Endologix is a medical devices company headquartered in Irvine, California.  Prior to, and continuing throughout the Relevant Period, Endologix's most promising medical product was the Nellix® Endovascular Aneurysm Sealing System ("Nellix EVAS System" or "Nellix"), which was touted as a new and groundbreaking treatment device for abdominal aortic aneurysms.  Traditionally, patients suffering from abdominal aortic aneurysms were treated using invasive, open surgical methods.  Treatment with the Nellix EVAS System, on the other hand, could be rendered using a small medical device, delivered via catheter, without open surgery.  Nellix was therefore marketed as a less invasive alternative to traditional aneurysm treatment, which in turn, minimized the risk of complications and reduced recovery time for patients.

3.     Endologix launched the Nellix EVAS System in Europe on a limited commercial basis in 2013.  To date, however, the device has not been available for use in the United States.  Before it could launch Nellix in the United States, Endologix needed to obtain premarket approval, or "PMA," for the device from the Food and Drug Administration ("FDA").  As part of the FDA's PMA process, Endologix was required to collect and submit nonclinical and human clinical data demonstrating the safety and effectiveness of the device.  As such, investors and securities analysts were keenly focused on news concerning the Nellix clinical

3

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

1  trials and the progress the Company was making in obtaining FDA approval for

2  the device.

3      4.    During the Relevant Period, the Individual Defendants painted a

4  falsely optimistic picture that premarket approval for Nellix was inevitable and

5  right around the corner. Accordingly, in the Company's SEC filings and during

6  investor conference calls, the Individual Defendants repeatedly assured the market

7  that clinical trials for the device were yielding positive results and that the

8  Company was "on track" to receive FDA approval by the end of 2016, or the early

9  part of 2017, at the latest.

10     5.    The narrative that Endologix was on track to receiving FDA approval

11  for the Nellix EVAS System was false and misleading. Indeed, what investors did

12  not know was that Nellix was plagued by serious safety concerns which were

13  holding up the PMA process. The most serious issue facing Nellix was that the

14  device was prone to move around, or migrate, from its initial placement within the

15  body. This problem, known as "migration," was known to cause catastrophic

16  medical complications in patients. The Individual Defendants, however, caused

17  the Company to downplay the severity of Nellix's migration problem, and instead

18  conveyed to the market that the problem could be easily fixed.

19     6.    Toward the end of 2016, it became increasingly clear that Endologix

20  was not on track to receive PMA as previously promised, due to concerns that

21  Nellix was prone to migration. Specifically, on November 16, 2016, the Company

22  shockingly announced that Nellix would not be receiving FDA approval within

23  the stated timeframe. The FDA had requested additional clinical data concerning

24  Nellix, which meant that PMA could not occur until the second quarter of 2018—

25  much later than promised. Following the announcement of the delay, the price of

26  Endologix stock fell $2.02 per share to close at $7.82 per share on November 16,

27  2016—a decline of over 20.5% from its previous closing price.

28

4

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

7.      Months later, on May 17, 2016, Endologix dropped another bombshell revelation—it was no longer seeking FDA approval of the first generation Nellix EVAS System at all.  Instead, the Company revealed that it was planning to seek approval of the second generation, or "Gen2" of the device, which would require the Company to conduct altogether new and separate clinical trials—***pushing the timeline for approval all the way out to 2020***.

8.      On this shocking news, the price of Endologix stock plummeted 36%, or $2.47 per share, to close at $4.26 on May 18, 2017—falling to its lowest level in several years.

9.      The Individual Defendants' false and misleading statements (and other wrongdoing, such as the failure to implement, maintain, or follow adequate internal controls) caused Endologix stock to trade at artificially inflated levels during the Relevant Period.  After the revelations concerning Endologix's inability to meet the promised timeframe for FDA approval of Nellix seeped into the market, the Company's stock was hammered by massive sales, driving down the share price from its artificially inflated highs, erasing hundreds of millions of dollars of the Company's market capitalization.

10.     The Individual Defendants' misconduct did not end there.  During the Relevant Period, Endologix's Board authorized the filing of proxy statements with the SEC, which urged stockholders to vote for the re-election of certain directors and approve certain executive compensation proposals, among other proposals.  In seeking stockholder votes in accord with the Board's recommendations, the proxy statements misrepresented and/or omitted material information concerning, among other things: (i) the failures of the Board and certain of its Committees to fulfill their duties, including oversight of internal controls and disclosures; (ii) that the Company was misrepresenting the timeframe for which it could obtain FDA approval for Nellix; and (iii) that Nellix was suffering from persistent migration problems that could not be fixed.

5

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

11.     The Board has not, and will not, commence litigation against the Individual Defendants named in this complaint, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to Endologix for authorizing or failing to correct the false and misleading statements alleged herein, and for failing to correct and/or implement the necessary internal controls to prevent the harm to the Company that has occurred.  Accordingly, a pre-suit demand upon the Board is a useless and futile act.  Thus, Plaintiff rightfully brings this action to vindicate the Company's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Endologix.

## JURISDICTION AND VENUE

12.     Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

13.     The Court has jurisdiction over each Defendant because each Defendant is either a corporation that does sufficient business in California, or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391(a) because: (i) Endologix maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Endologix occurred in this District; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

(iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

15.   In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## **THE PARTIES**

16.   Plaintiff Nick Cocco is a stockholder of Endologix and has continuously held stock in the Company since November 2015.

17.   Nominal Defendant Endologix is a Delaware corporation with principal executive offices at 2 Musick, Irvine, California 92618.  Traded on the NASDAQ Stock Market under the ticker symbol "ELGX," Endologix has more than 82,975,000 shares outstanding as of May 1, 2017.  Endologix develops, manufactures, markets, and sells medical devices primarily for the treatment of aortic disorders.

18.   Defendant John McDermott ("McDermott") has served as Chief Executive Officer ("CEO") and director of Endologix from May 2008 to the present.  Also, during the Relevant Period, McDermott served as the Company's Chairman of the Board until the Chairman position was formally separated from the CEO position in February 2017.  McDermott is a defendant in the Securities Class Action.  During the Relevant Period, McDermott received $3,201,133 in compensation as an executive of Endologix.

19.   Defendant Vaseem Mahboob ("Mahboob") has served as the Company's Chief Financial Officer from October 2015 to the present.  Mahboob is a defendant in the Securities Class Action.  During the Relevant Period, Mahboob received $1,221,606 in compensation as an executive of Endologix.

7

20.    Defendant Daniel Lemaitre ("Lemaitre") has been a director of the Company from December 2009 to the present.  Lemaitre was appointed Chairman of the Board in February 2017, after the Chairman position was formally separated from the CEO position.  During the Relevant Period, Lemaitre served as Chairman of Endologix's Nominating, Governance and Compliance Committee and also served on the Company's Audit Committee.  During the Relevant Period, Lemaitre received $209,495 in compensation as a director of Endologix.

21.    Defendant Leslie Norwalk ("Norwalk") has been a director of the Company from May 2015 to the present.  During the Relevant Period, Norwalk served on the Endologix's Nominating, Governance and Compliance Committee. During the Relevant Period, Norwalk received $156,448 in compensation as a director of Endologix.

22.    Defendant Guido J. Neels ("Neels") has been a director of the Company from December 2010 to the present.  Neels previously served on the board of directors of Nellix, a company that was acquired by Endologix in 2010. Endologix used the technology from the Nellix acquisition to develop the Nellix EVAS System.   During the Relevant Period, Neels served as Chairman of Endologix's Compensation Committee and also served on the Company's Nominating, Governance and Compliance Committee.   During the Relevant Period, Neels received $165,834 in compensation as a director of Endologix.

23.    Defendant Christopher G. Chavez ("Chavez") has been a director of the Company from February 2016 to the present.  During the Relevant Period, Chavez received $230,975 in compensation as a director of Endologix.

24.    Defendant Gregory D. Waller ("Waller") has been a director of the Company from November 2003 to the present.  During the Relevant Period, Waller served as Chairman of Endologix's Audit Committee and also served on the Company's Nominating, Governance and Compliance Committee.   Waller received $175,227 in compensation as a director of Endologix.

8

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

25.    Defendant Thomas C. Wilder, III ("Wilder"), has been a director of the Company from May 2010 to the present.  During the Relevant Period, Wilder served on Endologix's Audit Committee and the Compensation Committee.  Wilder received $153,555 in compensation as a director of Endologix.

26.    Defendant Thomas F. Zenty, III ("Zenty"), has been a director of the Company from May 2010 to the present.  During the Relevant Period, Zenty served on the Compensation Committee.  Zenty received $151,558 in compensation as a director of Endologix.

27.    Defendants identified in ¶¶ 18–26 are sometimes referred to herein as the "Individual Defendants."

28.    Defendants identified in ¶¶ 18, 20–26 are sometimes referred to herein as the "Director Defendants."

29.    Defendants Lemaitre, Waller, are Wilder are sometimes referred to herein as the "Audit Committee Defendants."

## SUBSTANTIVE ALLEGATIONS

### Endologix's Corporate Background and the Nellix EVAS System

30.    Headquartered in Irvine, California, Endologix is a biomedical devices company that develops and manufactures products intended for the minimally invasive endovascular treatment of abdominal aortic aneurysms.  Endologix's products are based on two primary platforms: (1) traditional minimally invasive endovascular aneurysm repair ("EVAR"); and (ii) endovascular aneurysm sealing ("EVAS"), which uses the Company's innovative solution for sealing the aneurysm sac while maintaining blood flow.  Endologix's current EVAS product is the Nellix EVAS System.

31.    Endologix's products are primarily targeted to individuals who suffer from atherosclerosis, a disease resulting in the thickening and hardening of arteries.  Atherosclerosis, which affects 5% to 6% of people over the age of 65, is

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

generally attributable to genetics, smoking, high blood pressure, and/or high cholesterol damage.

32.    Atherosclerosis reduces the integrity and strength of blood vessel walls, causing the vessel to balloon out—a condition known as an "aneurysm." Aneurysms are commonly diagnosed in the aorta, which is the body's largest artery.  An abdominal aortic aneurysm occurs when a portion of the abdominal aorta bulges into an aneurysm due to the weakening of the vessel wall, which may result in life-threatening internal bleeding upon rupture.  The overall patient mortality rate for ruptured abdominal aortic aneurysms is approximately 80%, making it a leading cause of death in the United States.

33.    Endologix's EVAR and EVAS products were developed as alternatives to traditional methods of treating abdominal aortic aneurysms, which generally involve invasive, open surgical procedures lasting two to four hours. EVAR and EVAS products, by contrast, use minimally invasive procedures lasting only an hour or two.  In addition, patients who receive EVAR and EVAS treatment typically have quicker recovery times and do not require the lengthy post-surgery convalescence associated with traditional open surgery.

34.    Endologix viewed the treatment of endovascular aortic aneurysms as a huge market opportunity, with a potential value of $4.0 billion.  To capitalize on this lucrative market, Endologix developed the Nellix EVAS System, a small medical device that could be delivered into the body via catheter and then used to seal the entire aneurysm sac.  According to Endologix, the Nellix technology substantially reduced the risk of complications associated with aneurysms, including the chance of endoleaks, a serious condition that occurs when blood leaks into the aneurysm sac.

35.    Endologix, therefore, viewed the Nellix EVAS System as a disruptive medical innovation that would enable the Company to capture a large part of the endovascular aneurysm treatment market and propel its growth prospects.  During

10

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

the May 5, 2015 Deutsche Bank Health Care Conference, Defendant Mahboob highlighted the innovative nature of Nellix, stating "we're trying to redefine the entire endovascular repair into endovascular sealing as we call it."

36.     In January 2013, Endologix announced that it had received "CE Mark" approval of the Nellix EVAS System, allowing the Company to commence a limited market introduction of the device in Europe.  CE marking is a mandatory conformity marking for medical devices and other products sold within the European Economic Area.  CE marking generally indicates that a particular product meets the threshold of safety, whereas FDA approval in the United States requires a more stringent showing of *both safety and effectiveness*.

37.     Although Nellix had launched on a limited basis in Europe, it has yet to be introduced commercially in the United States.  Before Nellix could be marketed and sold in the country, Endologix needed to obtain premarket approval, or PMA, the most stringent type of device marketing application required by the FDA.  Premarket approval is the process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices—devices that support or sustain human life, are of substantial importance in preventing impairment of human health, or which present a potential, unreasonable risk of illness or injury.

38.     To obtain premarket approval, Endologix was required collect and submit nonclinical and human clinical data on Nellix to demonstrate the safety and effectiveness of the device.  The collection of human clinical data was subject to certain FDA Investigational Device Exemption ("IDE") regulations.  An IDE application must be supported by specific data, including the results of animal and engineering testing of the device.  If an IDE application is approved by the FDA, human clinical studies may begin at a specific number of investigational sites with a maximum number of patients.  The clinical studies must also be conducted under

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

the review of an independent institutional review board to ensure the protection of the patients' rights.

39.    In December of 2013, Endologix received IDE approval from the FDA to begin a clinical trial of the Nellix EVAS System in the United States. The Company commenced the clinical trial, called the "EVAS Forward IDE," in January 2014, and enrollment in the trial was completed in November 2014. In May 2016, the Company announced the results of the one-year clinical data from the EVAS Forward IDE, which established that Nellix had met the study's primary endpoints for major adverse events at 30 days (safety), and treatment success at one year (effectiveness).

40.    Endologix also conducted an additional international study, known as the "EVAS Forward Global Registry," which was "designed to provide real world clinical results to demonstrate the effectiveness and broad applicability of the Nellix EVAS System." The Company announced the completion of patient enrollment in the EVAS Forward Global Registry in September 2014, and later announced that it would be conducting a follow-up study involving additional patients in November 2016.

41.    Against this backdrop, investors and analysts were keenly focused on Endologix's ability to obtain FDA premarket approval of Nellix, and the resulting impact it would have on the Company's revenue stream and growth prospects. Accordingly, during the Relevant Period, the Individual Defendants sought to reassure the market that the Company was progressing with the PMA process and that Nellix was on track to receive FDA approval by the fourth quarter of 2016, or the early part of 2017, at the latest.

42.    As it turned out, however, Nellix was not on track to receive FDA approval in the promised timeframe, as there were serious concerns about a "migration" problem affecting the device, which led to delays in the PMA process.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

43.     According to the FDA, migration occurs when an implanted device moves within the body, or is completely expelled from the body. Migration, if left untreated, can result in a Type I endoleak (blood flow into the aneurysm sac), aneurysm expansion, and rupture in its most catastrophic case.

44.     As set forth in a 2016 case report, doctors in the United Kingdom observed that the Nellix device was prone to migration, which in turn, heightened the risk of endoleaks and other catastrophic consequences.[1]  The case report cited another study which found that the migration rate for the Nellix EVAS System was 17%, compared to the 2.3% migration rate reported by the Company in the Nellix EVAS IDE.  The case report also discussed a patient whose aneurysm was treated with the Nellix EVAS System.  The Nellix EVAS device was removed from the patient after the device migrated and the aneurysm sac expanded, with case study authors noting that "in retrospect, we think that earlier intervention should have been undertaken to mitigate the risk of a catastrophic event."

45.     The study concluded that "[i]n the absence of a proximal fixation mechanism in EVAS, migration of the Nellix system should represent a more ominous sign, which would complicate a persistent type I endoleak resulting in continued aneurysm growth and inferior translocation of the stents within the aneurysm sac.  EVAS has failed to obliterate the long-term complication seen with conventional endovascular treatment . . . ."

46.     During the Relevant Period, Endologix's senior management attempted to downplay the migration issues that were affecting the device.  During a November 1, 2016 conference call with investors and analysts, Defendant McDermott characterized Nellix's migration problem as a recently discovered issue that was a "very easy situation to address."  McDermott gave the impression

---

[1]  Vasa (2016,) 45(6), 505-07. "Case Report: Nellix stent graft migration after endovascular aneurysm sealing", George A. Antoniou, Khalid Bashaeb, and Riza Ibrahim, published Aug. 29, 2016.

13

that the Company was aggressively taking charge of the situation, noting "I think people are giving us a lot of credit for being so proactive and getting out ahead of it. I will say there are some physicians who think we're being a little conservative. But our view is, let's think patient safety first, and then we can see some ways to open up these patient criteria moving forward." McDermott also assured investors that notwithstanding the concerns over migration, "[t]he Nellix PMA approval timelines are unchanged."

47. The reality was that Endologix's management had known about Nellix's migration problem for quite some time and that it was a serious, ongoing concern that made it impossible for the Company to obtain FDA approval within the promised timeframe.

**The Individual Defendants Disseminated and/or Caused the Company to Disseminate False and Misleading Statements During the Relevant Period**

48. On or around May 5, 2016, the Individual Defendants authorized members of Endologix's senior management to present at the Deutsche Bank Health Care Conference. During the Conference, Defendant Mahboob assured investors that the Company was on track to receive PMA by the fourth quarter of 2016, or the first quarter of 2017, at the latest:

> A lot of discussion about FDA approval in the U.S. We published a press release in April that we have submitted all of the four modules at the earnings call in February. We talked about submitting them within 60 days to 90 days after the earnings call. We're happy to report that we've submitted all the four modules to the FDA, they have them. And we have to wait for a 45-day period for the FDA to say that submission is complete, and then the 180-day window starts. And if you take that and say that and say 180 days gets you to the October-November time, that's what we've been saying consistently.

> I get a lot of questions about the panel, and John and our position is that there is nothing in the data that we see today that leads us to believe [] there will be a panel. But at the end of the day, this is the first PMA approval for EVAS versus EVAR and the agency will do what they have to. *But today, we feel pretty good about the timeline that we've been putting out consistently for the last six months to eight months, which is that we expect the approval to be in the Q4 [2016] to latest Q1 [2017] timeframe*. The one big piece

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

of data is going to be presented at SVS, which is on June 11 here in Boston, is the data for the IDE clinical data, which is going to be presented. And that's going to happen in June. ***So again, on track from a PMA milestone for a Q4 approval.***

49.    On May 9, 2016, the Individual Defendants caused Endologix to issue a press release announcing the Company's first quarter 2016 financial results for the three-month period ended March 31, 2016 ("Q1 2016").  The Company reported a net loss for Q1 2016 of $47.7 million, or $(0.62) per share, compared with a net loss of $11.2 million, or $(0.17) per share, and pro-forma net loss of $26.9 million for the first quarter of 2015.  The Company also reiterated its full year 2016 financial guidance, noting it expected 2016 revenue to be in the range of $192 million to $202 million.

50.    In the Q1 2016 press release, Defendant McDermott again confirmed that "[f]or Nellix, we . . . ***remain on track with our timeline for potential FDA approval at the end of 2016 or early 2017***."

51.    That same day, the Individual Defendants caused Endologix to host a conference call with analysts and investors, during which Defendants McDermott and Mahboob addressed questions concerning Nellix's overall performance and the Company's efforts to secure PMA for the device.  Responding to an analyst's question about Nellix's performance, Defendant Mahboob stated in part, "***Nellix continues to do a fantastic performance outside of the U.S.*** . . .  ***So I would say Nellix is doing as expected.  No surprises.***"

52.    When asked by an analyst to provide an update on the "FDA process," Defendant McDermott stated that the Company was on schedule with obtaining PMA approval: "At this point what ***I can tell you is the process is clicking ahead on schedule and the interaction [with the FDA] has been constructive***.  So right now everything continues to look like a PMA approval, hopefully, ***by the end of this year or first part of next year***."

15

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

53.    Also on May 9, 2016, the Individual Defendants caused Endologix to file a quarterly report on Form 10-Q with the SEC for Q1 2016 ("Q1 2016 10-Q"), which was signed by Defendants McDermott and Mahboob.  The Q1 2016 10-Q continued the narrative that Nellix was on track to receive FDA PMA within the promised timeframe by stating: "[w]e recently submitted our final premarket approval ("PMA") modules to the FDA and ***remain on schedule for potential PMA approval at the end of 2016 or early 2017.***"

54.    The Q1 2016 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2001 ("SOX") signed by Defendants McDermott and Mahboob, in their respective capacities as CEO and CFO.  The SOX certifications stated that the 10-Q "fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934 . . ." and "[t]he information contained in the Quarterly Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  Defendants McDermott and Davis further signed a separate certification stating, in relevant part:

1.    I have reviewed this quarterly report on Form 10-Q of Endologix, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated

16

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with generally accepted accounting principals;

c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

55.     On August 2, 2016, the Individual Defendants caused Endologix to issue a press release, announcing the Company's financial results for the second quarter of 2016, or the three-month period ended June 30, 2016 ("Q2 2016"). The Company reported a net loss for Q2 2016 of $66.8 million, or $(0.81) per share, compared with a net loss of $13.0 million, or $(0.19) per share, and pro-forma net loss of $27.9 million for the second quarter of 2015. The Company also raised its full year 2016 revenue guidance, stating it expected 2016 revenue to be in the

17

range of $197 million to $203 million, compared to $192 million to $202 million previously stated.

56.    In the Q2 2016 press release, Defendant McDermott stated that the Company's revenue performance in the second quarter was due in part by "strong growth with Nellix in international markets."   McDermott also stated: "[f]or Nellix, we reported several positive clinical data updates during the quarter, highlighted by the results from the EVAS FORWARD-IDE study.  These data featured significantly lower rates of endoleaks and secondary interventions with Nellix, which further increases our confidence in its long-term potential to be a market leading device in the treatment of AAA."

57.    Defendant McDermott also provided an update on the progress of the PMA process, stating: "[i]n July, we completed our 100-day PMA meeting with the FDA and remain confident in the approvability of Nellix.  The FDA has requested additional information related to our PMA submission and also indicated that we might need to go to an Advisory Committee Panel given the novelty of EVAS compared to traditional EVAR.  If we do not have to go to panel, *we still believe it's possible to receive PMA approval in the first quarter of 2017*.  If we do have to go to panel, we believe that it pushes out the potential PMA approval into the third quarter of 2017.  We are working very collaboratively with the FDA to provide the required information and remain confident in the PMA approval of Nellix based upon the IDE clinical results, data from other international studies and our worldwide experience which now includes over 6,000 patients."

58.    Also on August 2, 2016, the Individual Defendants caused Endologix to host a conference call with analysts and investors to discuss the Company's Q2 2016 financial results.  During the conference call, Defendant McDermott stated, "*we remain very positive about the likelihood of approval [for Nellix EVAS System] and the significant growth we expect to drive with Nellix*."  Moreover, in response to an analyst's inquiry whether there were any "red flag[s]"

18

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

concerning the data from the IDE study, McDermott stated that there were no

issues with the data, as follows:

> **[Analyst, Stifel Nicolaus & Company]:** Okay, that's very helpful.
> And I am going to slip in one last question, back on the panel. I'm
> sure you're eager to provide the intimate details of your FDA
> discussions. . . . But could you maybe give us a little bit more color,
> more sense of comfort that there's not something else going on; there
> was no red flag raised in some of the data that they saw? Anything
> that you could give us that gives us any comfort there would be
> helpful. Thank you.

> **[McDermott]:** Sure. So, the three reasons that the agency will
> typically consider sending a device to panel is; one, if there's any new
> clinical issues of safety or efficacy. And, obviously, ***everyone has
> seen the data so we know there aren't any issues there***. The second
> reason is if they feel, the FDA feels they don't have the clinical or
> technical expertise to complete the review of the PMA. That's not
> the case. So, the third is if it's novel technology.

59.    Further, during the August 2, 2016 conference call, Defendant

McDermott assured investors that the PMA process was not being held up by FDA

inquiries into the clinical data from the IDE study:

> **[Analyst, BMO Capital Markets]:** Hi. Can we talk a little bit about
> what type of additional data or questions that you're receiving? I
> mean is there any way to give us some information regarding that?

> **[McDermott]:** Yes, I don't want to get too detailed with that, Joanne.
> ***What I can tell you is that none of the questions we got asked are
> what I would characterize as big surprises.*** There's clarification on
> some things, some requests for additional analysis, some additional
> testing. ***Nothing that would suggest, in our view, any question or
> risk of approvability; just some more blocking and tackling and
> clarification of the data we submitted. So, we don't see anything in
> there that's giving us heartburn.*** It will just take a little time to pull
> it all together. And we'd also like to take another run at this novelty
> question and see if we can provide the agency with enough evidence
> that the device isn't novel so that we don't have to go to panel. So,
> that will be the focus of the work we do over the next few months.

> A few days later, on August 10, 2016, the Individual Defendants
> caused representatives of Endologix to attend the Canaccord Genuity
> Growth Conference. During the Conference, Defendant McDermott
> touted the groundbreaking nature of Nellix and continued to convey
> that the PMA process was advancing within the stated timeframe.
> McDermott noted: So that's why when—if you do any work or talk
> to physicians, there's quite a lot of buzz about Nellix coming to
> market. So, that said, we announced on our call last week that we've
> completed our FDA trial. The data has been presented.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

Now we are in our discussions with the FDA. All of the modules have been submitted. We are completed with our FDA audits. ***Things are clicking along pretty nicely***.

60.    On November 1, 2016, the Individual Defendants caused Endologix to issue a press release, announcing the Company's financial results for the third quarter of 2016, or the three-month period ended September 30, 2017 ("Q3 2016"). The Company reported a net loss for Q3 2016 of $15.2 million, or $(0.18) per share, compared with a net loss of $10.9 million, or $(0.16) per share, and pro-forma net loss of $24.5 million for the third quarter of 2015.

Later that day, the Individual Defendants caused Endologix to host a conference call with investors and analysts to discuss the Company's Q3 2016 financial results. During the Q3 2016 conference call, Defendant McDermott again provided assurances that the PMA process was progressing as promised: In terms of the US PMA, we achieved the clinical endpoints in the IDE and have shared the latest clinical data with FDA. ***We've also provided them with our updated patient selection criteria and have had positive discussions so far. The Nellix PMA approval timelines are unchanged, although we think a panel is more likely now, given the updated indications***.

61.    During the November 1, 2016 conference call, Endologix's senior management addressed the issue of migration. Defendant McDermott conveyed that the migration problems affecting Nellix had only recently come to the Company's attention:

Regarding Nellix, ***we recently ran an updated data cut from the IDE clinical database, and noticed an increase in migration in aneurysm enlargement in some patients with 2-year follow-up***. We've learned that migration with Nellix can occur in patients with small flow lumens and a lot of thrombus, because there isn't enough space to inject sufficient polymer to support the stents. ***Our solution is a simple update to the patient selection criteria*** that measures the ratio of an aneurysm diameter to the flow lumen, to ensure there's enough space for polymer.

                            *    *    *

When we examined the IDE data for patients that fit within this updated selection criteria, ***we see extremely positive safety and durability results out to 2 years***, which gives us confidence that Nellix can be a leading device in the treatment of abdominal aortic aneurysms.

20

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

62.     Defendant McDermott went on to emphasize Endologix's favorable interactions with the FDA, reassuring investors that any concerns related to migration were minimal by stating in part: "we did have a successful clinical study and met the endpoints in the trial.  So actually when we've interacted with the agency so far on the updated indications, they've responded favorably.  ***They had some questions about migration and a curiosity if it was progressive. . . .  We can't really get into any of the data details at this point in time. . . .  But what I can tell you is that the re-interventions related to this issue are extremely low.***"

63.     Defendant McDermott further stated that the issue of migration was "***a very easy situation to address*** just by narrowing for those particular anatomies," adding that "I think people are giving us a lot of credit for being so proactive and getting out ahead of it.  I will say there are some physicians who think we're being a little conservative.  But our view is, let's think patient safety first, and then we can see some ways to open up these patient criteria moving forward."

64.     On November 8, 2016, the Individual Defendants caused Endologix to file a quarterly report on Form 10-Q with the SEC for Q3 2016 ("Q3 2016 10-Q"), signed by Defendants McDermott and Mahboob.   The  Q3 2016 10-Q continued to provide the impression that Nellix was on track to receive FDA PMA within the promised timeframe, stating in part: "[w]e are working collaboratively and in a timely manner with the FDA to provide the required information, ***and we remain confident that we will receive PMA approval for Nellix EVAS System based upon the IDE clinical results, data from other international studies and our worldwide experience***, which now includes over 7,000 patients."

65.     The Q3 2016 10-Q contained certifications, signed by McDermott and Mahboob, that were similar to the certifications described in ¶ 54, attesting the accuracy and completeness of the financial report.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

## THE REASONS WHY THE STATEMENTS WERE IMPROPER

66.    The statements referenced above were materially false and misleading when made because they misrepresented or failed to disclose the following adverse facts.  The true facts, which were known or recklessly disregarded by the Individual Defendants but were concealed from the investing public, were as follows:

> (a)    the Nellix EVAS System was not on track for FDA approval by the end of 2016, or the early part of 2017, at the latest, due to the severe problems with migration which made the device ineligible for FDA approval;
>
> (b)    the migration problems affecting the Nellix EVAS System was not a recently discovered issue, but rather, a long-term concern known to the Company;
>
> (c)    there was no "easy" or "simple" fix for the migration problem affecting the Nellix EVAS System; rather, the problem was so severe that the Company had to totally abandon its efforts to obtain PMA approval of the first generation of the device; and
>
> (d)    based on the foregoing, the Individual Defendants lacked a reasonable basis for their positive statements about the Company's financial performance and outlook during the Relevant Period.

67.    As a result of the Individual Defendants' false and misleading statements and omissions, Endologix shares traded at artificially inflated prices during the Relevant Period.  Once the true facts regarding the Company's financial prospects and future business prospects began to emerge, the Company's stock price fell dramatically, erasing hundreds of millions of dollars in market capitalization.

22

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

## **THE TRUTH EMERGES**

68.    On November 16, 2016, in advance of the Company's 2016 Investor
Meeting, Endologix issued a press release entitled "Endologix Provides Update on
Nellix PMA Process."  The press released revealed for the first time that the Nellix
EVAS System would not be receiving FDA approval within the previously
promised timeline.  It was further revealed in the press release that the FDA had
requested the Company to provide two-year patient follow-up data from the Nellix
EVAS Forward IDE Study.  This meant that potential premarket approval of Nellix
could not occur until the second quarter of 2018, delaying approval for at least an
additional 18 months from the time the Company had previously announced.

69.    McDermott was quoted in the press released as saying: "[w]e're
disappointed by these requirements and the resulting delay, but encouraged by the
2-year clinical outcomes we have seen so far with Nellix under our newly revised
instructions for use.  We remain committed to EVAS with Nellix and have
demonstrated outstanding clinical results in selected patients with both traditional
and complex AAA anatomies."

70.    The market responded negatively to this shocking announcement, and
the price of Endologix stock fell $2.02 per share, or over 20.5%, to close at
$7.82 per share on November 16, 2016.

71.    During the Company's 2016 Investor Meeting held the next day,
Defendant McDermott provided additional information concerning the delay of
the PMA process and explained that the FDA's request for additional data
stemmed from concerns over migration:

> **[Analyst, RTC]:** Can you share with us were there migration issues
> in that subset of patients that the FDA already saw and is that why
> they're saying give me the two years for everybody?

> **[McDermott]:** Yes.  So everybody saw the one-year data which was
> 2.3% of patients had a 10 millimeter migration or more at one year.
> What we saw was when we did an updated data cut for our response,
> some of those patients went on to migrate more and there were some

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

patients that hadn't displayed any migration at one year that showed signed of migration in year two.

And although most of those findings were still hadn't triggered interventions, there were some and I'm not going to tell you there were zero intervention. I honestly, right now, don't know the exact number off the top of my head, but it was really the change in the rate. It was the increase in the rate from year one to year two and that's what drove the discussion.

72.   Months later, on May 17, 2017, Endologix delivered the *coup de grâce* when it finally revealed that after meeting with the FDA, the Company would not be seeking approval of the first generation Nellix EVAS System at all. Instead, the Company announced it would be seeking approval of an altogether new version of the device—the "Gen2" Nellix EVAS System. This required a completely separate clinical trial, which in turn, would push the timeline for approval of the Nellix EVAS System all the way out to 2020.

73.   In the May 17, 2017 press release entitled "Endologix Provides an Update on the Nellix Endovascular Aneurysm Sealing System U.S. Regulatory Status," Endologix informed investors that it had met with the FDA and that "based upon that meeting and further internal analysis, the company has determined that it will seek U.S. approval of the Nellix® EVAS System by conducting a confirmatory clinical study with the previously updated Instructions for Use (IFU) and the Gen2 device design . . . . The Company will collaborate with the FDA over the coming months on the confirmatory clinical study protocol and anticipates beginning patient enrollment in the fourth quarter of this year with PMA approval estimated to occur in 2020."

74.   On the heels of this bombshell announcement, the price of Endologix stock declined more than $2.47 per share, or 36%, from their closing price of $6.73 on May 17, 2017, to close at $4.26 on May 18, 2017.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

1
2
3

# THE DIRECTOR DEFENDANTS VIOLATED SECTION 14(a) OF THE EXCHANGE ACT AND SEC RULE 14a-9, IN FURTHER BREACH OF THEIR FIDUCIARY DUTIES

4      75.    The Director Defendants also violated Section 14(a) of the Exchange

5  Act and SEC Rule 14a-9 by causing Endologix to issue proxy statements

6  containing materially false and misleading statements.  The Director Defendants'

7  failure to disclose material facts in the proxy statements likewise constitutes a

8  breach of their fiduciary duties.  Plaintiff expressly disclaims any fraud or

9  intentional wrongdoing as to the proxy statement claims, as the claims are based

10  solely on the Director Defendants' negligent actions.

11  **The Director Defendants Caused Endologix to Issue the Materially False or Misleading 2016 Proxy Statement**

12

13      76.    On May 2, 2016, the Director Defendants caused Endologix to file a

14  proxy statement on Schedule 14A with the SEC (the "2016 Proxy Statement") in

15  connection with the 2016 annual stockholders meeting to be held on June 2, 2016.

16  In the 2016 Proxy Statement, the Director Defendants solicited stockholder votes

17  to re-elect the "Class III" directors, namely Defendants Waller, Wilder, and Zenty,

18  and to approve the compensation of the Company's executive officers, among

19  other proposals.

20      77.    With respect to the proposal to re-elect certain directors, the

21  2016 Proxy Statement contained the following statements in the section entitled

22  "Board of Directors Involvement in Risk Oversight":

23      Our board of directors oversees our risk management practices
       and strategies, taking an enterprise-wide approach to risk
24      management that seeks to complement our organizational and
       strategic objectives, long-term performance and the overall
25      enhancement of stockholder value.  Our board's approach to risk
       management includes developing a detailed understanding of the
26      risks we face, analyzing them with the latest information available,
       and determining the steps that should be taken to manage those risks,
27      with a view toward the appropriate level of risk for a company of our
       size and financial condition.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

While our board of directors has the ultimate responsibility for the risk management process, senior management and various committees of our board of directors also have responsibility for certain areas of risk management.

Our senior management team is responsible for day-to-day risk management and regularly reports on risks to our full board of directors or a relevant committee. Our legal, finance and regulatory areas serve as the primary monitoring and evaluation function for company-wide policies and procedures, and manage the day-to-day oversight of the risk management strategy for our ongoing business. This oversight includes identifying, evaluating, and addressing potential risks that may exist at the enterprise, strategic, financial, operational, compliance and reporting levels.

The Audit Committee focuses on financial compliance risk, working closely, for example, with management and our independent registered public accounting firm. The Compensation Committee assesses risks related to our compensation programs. In setting performance metrics, our Compensation Committee creates incentives for our senior executives that encourage an appropriate level of risk-taking that is commensurate with our short-term and long-term strategies. The Nominating, Governance and Compliance Committee monitors our compliance with all legal and regulatory requirements that affect our company and works closely with our internal compliance officers and outside legal counsel to identify and assess key operational risks related to legal and regulatory compliance, as well as appropriate mitigation strategies.

78.    The 2016 Proxy Statement went on to describe the specific responsibilities and duties of the Audit Committee of the Board as follows:

The Audit Committee has the sole authority to appoint and, when deemed appropriate, replace our independent registered public accounting firm, and has established a policy of pre-approving all audit and permissible non-audit services provided by our independent registered public accounting firm. The Audit Committee has, among other things, the responsibility to:

•    review and approve the scope and results of the annual audit;

•    evaluate with the independent registered public accounting firm the performance and adequacy of our financial personnel and the adequacy and effectiveness of our systems and internal financial controls;

•    review and discuss with management and the independent registered public accounting firm the content of our financial statements prior to the filing of our quarterly reports on Form 10-Q and annual reports on Form 10-K;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

• establish procedures for receiving, retaining and investigating reports of illegal acts involving us or complaints or concerns regarding questionable accounting or auditing matters;

• establish procedures for the confidential, anonymous submission by our employees of concerns or complaints regarding questionable accounting or auditing matters; and

• assist our board of directors in its oversight of our compliance with legal and regulatory requirements.

79.    The foregoing statements conveyed that the Board maintained sufficient and adequate risk management, financial compliance, and audit oversight programs and procedures. The 2016 Proxy Statement, however, omitted any disclosures concerning: (i) the Company's inadequate internal and disclosure controls; (ii) the Company's reporting failures concerning the performance of the Nellix EVAS System, the migration problems that plagued the device, and the Company's inability to obtain PMA for the device; and (iii) the Board-approved compensation programs that incentivized the reporting failures.

80.    The 2016 Proxy Statement also urged stockholders to approve an advisory resolution regarding compensation paid to certain senior executives, including Defendants McDermott and Mahboob.  In soliciting approval of the so-called "say-on-pay" compensation proposal, the 2016 Proxy Statement stated:

Our executive compensation practices are designed to attract, retain and reward our executives and strengthen the mutuality of interests between our executives and our stockholders in order to motivate our executives to maximize stockholder value. The primary goals of our executive compensation program are to motivate our executive officers to cause us to achieve the best possible financial and operational results, to attract and retain high quality executives who can provide effective leadership, consistency of purpose and enduring relations with relevant stockholders and to align the long-term interests of our executive officers with those of our stockholders.

Our executive compensation program primarily consists of a base salary, cash incentive payments upon the achievement of corporate objectives and time-and performance-based equity incentive awards, which are generally in the form of stock options and restricted stock unit awards.  The equity component of our compensation program is designed to align a portion of each executive officer's compensation with the interests of our stockholders to create long term value.  We encourage you to

27

carefully review the section entitled "Compensation Discussion and Analysis" in this proxy statement for additional information on our executive compensation programs and practices, as well as the Summary Compensation Table and other related compensation tables and narrative disclosure, which describe the compensation of our named executive officers.

We are asking our stockholders to indicate their support for the compensation of our named executive officers as described in this proxy statement.

81.    The foregoing statements conveyed that Endologix's compensation system encouraged proper risk management, the achievement of the "best possible financial and operational results," and the alignment of the long-term interests of the Company's executive officers with those of its stockholders.  In reality, the Company's compensation system encouraged—and consistently rewarded—the non-disclosure and inadequate reporting of material information concerning the Company's operations, financial performance, and other business concerns like the Nellix EVAS System.

82.    The 2016 Proxy Statement also misrepresented and/or failed to disclose that the Nellix EVAS System was not on track for FDA approval in fourth quarter 2016 due to the severe, longstanding problems with migration.

83.    Many Endologix stockholders, deprived of the material information described above, later voted to re-elect the slate of proposed directors and support the say-on-pay compensation proposal.

**The Director Defendants Caused Endologix to Issue the Materially False or Misleading 2017 Proxy Statement**

84.    On May 1, 2017, the Director Defendants caused Endologix to file the file a proxy statement on Schedule 14A with the SEC (the "2017 Proxy Statement") in connection with the 2017 annual stockholders meeting to be held on May 31, 2017.  In the 2017 Proxy Statement, the Director Defendants solicited stockholder votes to re-elect the "Class I" directors, namely Defendants Lemaitre

28

and Norwalk, and approve the compensation of the Company's executive officers, among other proposals.

85.    With respect to the proposal to re-elect certain directors, the 2017 Proxy Statement contained the following statements in the section entitled "Board of Directors Involvement in Risk Oversight":

> Our board of directors oversees our risk management practices and strategies, taking an enterprise-wide approach to risk management that seeks to complement our organizational and strategic objectives, long-term performance and the overall enhancement of stockholder value. Our board's approach to risk management includes developing a detailed understanding of the risks we face, analyzing them with the latest information available, and determining the steps that should be taken to manage those risks, with a view toward the appropriate level of risk for a company of our size and financial condition.

> While our board of directors has the ultimate responsibility for the risk management process, senior management and various committees of our board of directors also have responsibility for certain areas of risk management.

> Our senior management team is responsible for day-to-day risk management and regularly reports on risks to our full board of directors or a relevant committee. Our legal, finance and regulatory areas serve as the primary monitoring and evaluation function for company-wide policies and procedures, and manage the day-to-day oversight of the risk management strategy for our ongoing business. This oversight includes identifying, evaluating, and addressing potential risks that may exist at the enterprise, strategic, financial, operational, compliance and reporting levels.

> The Audit Committee focuses on financial compliance risk, working closely, for example, with management and our independent registered public accounting firm. The Compensation Committee assesses risks related to our compensation programs. In setting performance metrics, our Compensation Committee creates incentives for our senior executives that encourage an appropriate level of risk-taking that is commensurate with our short-term and long-term strategies. The Nominating, Governance and Compliance Committee monitors our compliance with all legal and regulatory requirements that affect our company and works closely with our internal compliance officers and outside legal counsel to identify and assess key operational risks related to legal and regulatory compliance, as well as appropriate mitigation strategies.

86.    The 2017 Proxy Statement also described the specific responsibilities and duties of the Audit Committee of the Board as follows:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

The Audit Committee has the sole authority to appoint and, when deemed appropriate, replace our independent registered public accounting firm, and has established a policy of pre-approving all audit and permissible non-audit services provided by our independent registered public accounting firm. The Audit Committee has, among other things, the responsibility to:

- review and approve the scope and results of the annual audit;

- evaluate with the independent registered public accounting firm the performance and adequacy of our financial personnel and the adequacy and effectiveness of our systems and internal financial controls;

- review and discuss with management and the independent registered public accounting firm the content of our financial statements prior to the filing of our quarterly reports on Form 10-Q and annual reports on Form 10-K;

- establish procedures for receiving, retaining and investigating reports of illegal acts involving us or complaints or concerns regarding questionable accounting or auditing matters;

- establish procedures for the confidential, anonymous submission by our employees of concerns or complaints regarding questionable accounting or auditing matters; and

- assist our board of directors in its oversight of our compliance with legal and regulatory requirements.

87.    The foregoing statements conveyed that the Board maintained sufficient and adequate risk management, financial compliance, and auditing oversight programs and procedures. The 2017 Proxy Statement, however, omitted material disclosures concerning: (i) the Company's inadequate internal and disclosure controls; (ii) the reporting failures concerning the performance of the Nellix EVAS system, the migration problems that plagued the device, and the Company's inability to obtain PMA for the device; and (iii) the Board-approved compensation programs that incentivized the reporting failures.

88.    The 2017 Proxy Statement also urged stockholders to approve an advisory resolution regarding compensation paid to certain senior executives, including Defendants McDermott and Mahboob. In soliciting approval of the so-called "say-on-pay" compensation proposal, the 2017 Proxy Statement stated:

30

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

1
2
3
4
5
6

Our executive compensation practices are designed to attract, retain and reward our executives and strengthen the mutuality of interests between our executives and our stockholders in order to motivate our executives to maximize stockholder value. The primary goals of our executive compensation program are to motivate our executive officers to cause us to achieve the best possible financial and operational results, to attract and retain high quality executives who can provide effective leadership, consistency of purpose and enduring relations with relevant stockholders and to align the long-term interests of our executive officers with those of our stockholders.

7
8
9
10
11
12
13

Our executive compensation program primarily consists of a base salary, cash incentive payments upon the achievement of corporate objectives and time-and performance-based equity incentive awards, which are generally in the form of stock options and restricted stock unit awards. The equity component of our compensation program is designed to align a portion of each executive officer's compensation with the interests of our stockholders to create long term value. We encourage you to carefully review the section entitled "Compensation Discussion and Analysis" in this proxy statement for additional information on our executive compensation programs and practices, as well as the Summary Compensation Table and other related compensation tables and narrative disclosure, which describe the compensation of our named executive officers.

14
15

We are asking our stockholders to indicate their support for the compensation of our named executive officers as described in this proxy statement.

16
17
18
19
20
21
22
23

89.    The foregoing statements conveyed that Endologix's compensation system encouraged proper risk management, the achievement of the "best possible financial and operational results," and the alignment of the long-term interests of the Company's executive officers with those of its stockholders.  In reality, the Company's compensation system encouraged—and consistently rewarded—the non-disclosure and inadequate reporting of material information concerning the Company's operations, financial performance, and other business concerns including the Nellix EVAS System.

24
25
26

90.    The 2017 Proxy Statement also misrepresented and/or failed to disclose that the Nellix EVAS System was not on track for FDA approval in the promised timeframe, due to the severe, longstanding problems with migration.

27
28

31

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

91. By reason of their positions as officers, directors, and/or fiduciaries of Endologix, and because of their ability to control the business and corporate affairs of Endologix, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Endologix in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Endologix and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

92. Each director and officer of the Company owes to Endologix and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

93. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

**Audit Committee Duties**

94. In addition to these duties, the members of Endologix's Audit Committee (Defendants Lemaitre, Waller and Wilder) owed specific duties to the Company under its Audit Committee Charter, including reviewing and approving quarterly and annual financial statements and earnings press releases, and ensuring that the Company had appropriate and effective internal controls over financial reporting.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

95.     According to the Audit Committee Charter, the Audit Committee was formed to:

(1)     Assist the Board in fulfilling its responsibilities relating to the oversight of:

(a)     the integrity of the financial statements of the Company,

(b)     the independent auditor's qualifications and independence,

(c)     the performance of the Company's independent auditors, and

(d)     the compliance by the Company with legal and regulatory requirements;

(2)     Prepare the audit committee report that the rules of the Securities and Exchange Commission (the "Commission") require to be included in the Company's annual proxy statement; and

(3)     To provide such other assistance that the Board, from time to time, requests.

96.     Specifically, with respect to financial statement and disclosure matters, the members of the Audit Committee owed the following specific duties to Endologix under the Audit Committee Charter:

1.     Review and discuss with management and the independent auditor the annual audited financial statements, including disclosures made in management's discussion and analysis of financial condition and results of operations, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

2.     Review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including the results of the independent auditor's review of the quarterly financial statements.

3.     Discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting.

4.     Discuss with management any major issues as to the adequacy of the Company's disclosure controls and procedures and internal control over financial reporting and any special steps adopted in light of material control deficiencies.  Discuss with external auditors any

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

significant matters regarding internal control over financial reporting that have come to their attention during the conduct of the audit.

5.      Review and discuss with the Company's independent auditor and management, at least annually, reports from the independent auditor on:

(a)      All critical accounting policies and practices used by the Company and those which the Company intends to use.

(b)      All alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

(c)      Other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

6.      Discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies.  The chair of the Committee may represent the entire Committee for purposes of this review.  The discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

7.      Discuss with management and the independent auditor the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the Company's financial statements.

8.      Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

9.      Discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

10.      Review disclosures made to the Audit Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

11.      Review management's report on internal control over financial reporting and the independent auditors' attestation and report on management's internal control over financial reporting to be included

34

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

in the Company's Annual Report on Form 10-K prior to its filing with the Commission.

97.    Further, under the Audit Committee Charter, the members of the Audit Committee owed duties to Endologix concerning compliance oversight, including the following responsibilities:

1.    Obtain from the independent auditor assurance that all communications required by Section 10A(b) of the Exchange Act have been made.

2.    Obtain reports from management that the Company and its subsidiary/foreign affiliated entities are in conformity with applicable legal requirements and the Company's Code of Ethics for the CEO and senior financial officers.

3.    Obtain reports from the Company's Compliance Officer regarding conformity of the Company's operations with the Company's Comprehensive Compliance Program and Code of Ethics for Interactions with Health Care Professionals, including applicable state laws.

4.    Confirm with the independent auditors that nothing has come to their attention during the course of their work with the Company that the Company may not be in compliance with applicable legal requirements.

5.    Review reports and disclosures of insider and affiliated party transactions.

6.    Advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Ethics for the CEO and senior financial officers and with the Comprehensive Compliance Program and Code of Ethics for Interactions with Health Care Professionals. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, auditing or compliance matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting, auditing or compliance matters.

7.    Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports which raise material issues regarding the Company's financial statements or accounting policies.

8.    Discuss with the Company's General Counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

9.     Perform any other activities consistent with this Charter as the Committee or the Board deems necessary or appropriate.

98.     Upon information and belief, throughout the Relevant Period, Endologix maintained an Audit Committee Charter (or charters) that was (or were) materially and substantially the same in substance as the Company's current Charter described herein.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

99.     Additionally, the Individual Defendants, as officers and/or directors of Endologix, were bound by the Company's Code of Business Conduct and Ethics (the "Code"), which was comprised of multiple compliance documents and industry codes of ethics, as specifically referenced on the Company's corporate website, including the following: (i) Compliance Declaration, (ii) Comprehensive Corporate Compliance Program, (iii) Employee Communication Channels, (iv) Global Business Conduct Standards with Health Care Professionals, (v) AdvaMed Code of Ethics, and (vi) MedTech Europe Code of Ethical Business Practice.

100.   As stated in the Compliance Declaration of the Code, representatives of Endologix, including the Individual Defendants, were obligated to hold themselves to the "highest standards of business conduct," "comply with the many laws and regulations that affect [the Company's] activities worldwide," and demand "honesty and ethical behavior in all that [the Company does]." Based on information and belief, the foregoing Declaration was made in May 2016, and again in May 2017.

101.   Upon information and belief, the Company maintained versions of the documents that comprised the Code during the Relevant Period, which imposed the same, or substantially and materially the same or similar, duties on, among others, the Board, as those set forth above.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

**Control, Access, and Authority**

102.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Endologix, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Endologix.

103.   Because of their advisory, executive, managerial, and directorial positions with Endologix, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Endologix.

104.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Endologix, and was at all times, acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

105.   To discharge their duties, the officers and directors of Endologix were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Endologix were required to, among other things:

> (a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

> (b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

> (c)     properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

including making accurate statements about the Company's business and financial prospects and internal controls;

(d)    remain informed as to how Endologix conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)    ensure that Endologix was operated in a diligent, honest, and prudent manner and ensure compliance with all applicable laws, rules, and regulations.

## **BREACHES OF DUTIES**

106.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Endologix and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Endologix, as well as in the use and preservation of its property and assets.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Endologix, the absence of good faith on their part, and a reckless disregard for their duties to Endologix and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to Endologix.    The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants, who collectively comprised the entirety of Endologix's Board.

107.    The Individual Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

108.   In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws.  As a result, Endologix has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

109.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

110.   During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

111.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

112.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the

39

Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

113.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## **DAMAGES TO ENDOLOGIX**

114.   As a result of the Individual Defendants' wrongful conduct, Endologix disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Endologix's credibility.  Endologix has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

115.   As a direct and proximate result of the Individual Defendants' actions as alleged above, Endologix's market capitalization has been substantially damaged, having lost hundreds of millions of dollars in value, as a result of the conduct described herein.

116.   Further, as a direct and proximate result of the Individual Defendants' conduct, Endologix has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred in investigating and defending Endologix and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

(b)    costs incurred from compensation and benefits paid to the Individual
Defendants, which compensation was based, at least in part, on
Endologix's artificially-inflated stock price; and

(c)    costs incurred from the loss of the Company's customers' confidence
in Endologix's products and services.

117.    Moreover, these actions have irreparably damaged Endologix's
corporate image and goodwill.  For at least the foreseeable future, Endologix will
suffer from what is known as the "liar's discount," a term applied to the stocks of
companies who have been implicated in illegal behavior and have misled the
investing public, such that Endologix's ability to raise equity capital or debt on
favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

118.    Plaintiff brings this action derivatively in the right and for the benefit
of Endologix to redress injuries suffered, and to be suffered, by Endologix as a
direct result of the Individual Defendants' breaches of fiduciary duties and unjust
enrichment, as well as the aiding and abetting thereof, by the Individual
Defendants.  Endologix is named as a nominal defendant solely in a derivative
capacity.

119.    Plaintiff will adequately and fairly represent the interests of
Endologix in enforcing and prosecuting its rights.

120.    Plaintiff was a shareholder of Endologix common stock at the time of
the wrongdoing of which Plaintiff complains, and has been continuously since.

121.    Plaintiff did not make a pre-suit demand on the Board to pursue this
action because such a demand would have been a futile and wasteful act.

122.    At the time this action was commenced, the Board of Endologix
consisted of the following eight (8) directors: Defendants Lemaitre, McDermott,
Chavez, Neels, Norwalk, Waller, Wilder, and Zenty.  A majority of these
individuals are not disinterested and independent with respect to the acts and

41

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

omissions alleged herein.  Notably, all of these individuals face a substantial likelihood of personal liability for their violations of Section 14a of the Exchange Act and breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care described herein.  Where a plaintiff alleges that at least half of the members of the current board are not independent or disinterested, demand is excused as futile.

**Demand is Futile as to the Director Defendants Because They Face a Substantial Likelihood of Liability**

123.   Director Defendants Lemaitre, McDermott, Chavez, Neels, Norwalk, Waller, Wilder, and Zenty face a substantial likelihood of liability for their individual misconduct.  As alleged herein, each of the Director Defendants violated Section 14(a) of the Exchange Act by negligently making the misstatements and omissions in the 2016 and 2017 Proxy Statements.  Accordingly, demand is excused because each member of the Board at the time this action was commenced faces a substantial likelihood of liability

124.   The Director Defendants also breached their fiduciary duties of loyalty, good faith, and candor by causing or allowing improper statements to be made in the Company's press releases, investor conference calls and presentations, and SEC filings regarding the Nellix EVAS System and the ability of the Company to obtain FDA premarket approval for the device.

125.   Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and

42

misleading statements throughout the Relevant Period that caused Endologix's stock to trade at artificially-inflated prices.

126.  The Director Defendants also wasted corporate assets by paying improper compensation and bonuses to certain of the Company's executive officers and directors.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

127.  The Director Defendants' making or authorization of false and misleading statements during the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control, constitute breaches of fiduciary duties, for which they face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Endologix to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile.

**Demand is Futile as to the Audit Committee Defendants**

128.  Pursuant to the Audit Committee Charter, Audit Committee Defendants Lemaitre, Waller, and Wilder were responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing Endologix's internal controls over financial reporting, and discharging their other duties described herein.  Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

approved, or failed to exercise due diligence and reasonable care in reviewing and preventing, the dissemination of false and/or materially misleading earnings press releases and earnings guidance, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects were accurate. Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Audit Committee Defendants therefore is futile.

**Demand is Futile as to Defendant McDermott**

129. Demand is futile as to Defendant McDermott, as Endologix admits McDermott does not meet the standards for director independence, given his current role as CEO of the Company.

130. McDermott also cannot disinterestedly consider a demand to bring suit against himself because McDermott is a named defendant in the Securities Class Action, which alleges that he made many of the same misstatements described above in violation of the federal securities laws. Thus, if McDermott were to initiate suit in this action, he would compromise his ability to simultaneously defend himself in the Securities Class Action and would expose himself to liability in this action. This he will not do.

131. McDermott is also interested, and therefore not independent or disinterested, because he has financially benefitted from his own wrongdoing and the wrongdoing of the other Individual Defendants, and because his livelihood continues to depend on compensation from Endologix. For example, in 2016, at a time when he was making and causing Endologix to make material misstatements concerning the Nellix EVAS System and the Company's efforts to obtain FDA PMA for the device, McDermott received more than $3.2 million in total compensation from Endologix, including salary, bonus, stock awards, option awards, and other compensation. As such, McDermott cannot independently

consider any demand to sue himself for breaching his fiduciary duties to Endologix because that would expose him to liability and threaten his livelihood.

**Demand is Futile as to All Director Defendants for Additional Reasons**

132.  The Board of Endologix has already demonstrated that it cannot independently and disinterestedly consider a pre-suit demand to bring the claims set forth herein.  Despite the wrongdoing of the Company's executive officers, including Defendants McDermott and Mahboob, who, respectively, still serve as the Company's CEO and CFO, the Board has taken no action to address the harm this misconduct has caused the Company.

133.  Each of the current directors receives an annual cash compensation, as well as awards of Endologix stock, purely for being a Board member.  This compensation provides a substantial stipend to these directors, from which each of them personally benefits and depends on for his or her livelihood.  Demand on each of the directors is futile because, through their course of conduct to date, they have demonstrated their unwillingness to undertake any action that would threaten the economic benefits they receive as members of Endologix's Board.

134.  If Endologix's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the shareholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Director Defendants in this case contain provisions that eliminate coverage for any action brought directly by Endologix against the Director Defendants, known as the "insured versus insured exclusion."

135.  As a result, if the members of Endologix's Board were to sue themselves or certain officers of Endologix, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.

On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the members of the Board cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

136. Under the factual circumstances described herein, the Director Defendants are more interested in protecting themselves than they are in protecting Endologix by prosecuting this action. Therefore, demand on Endologix and its Board is futile and is excused.

137. Endologix has been, and will continue to be, exposed to significant losses due to the Individual Defendants' wrongdoing. Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct. Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

138. Plaintiff has not made any demand on shareholders of Endologix to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Endologix is a publicly traded company with thousands of shareholders of record and at least hundreds of thousands of beneficial owners;

(b)    making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of Endologix shareholders; and

(c)    making demand on all shareholders would force Plaintiff to incur excessive expenses and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

46
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

## COUNT I

### Against the Director Defendants for Violations of Section 14(a) of the Exchange Act

139.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the non-fraud claims.

141.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."

142.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

143.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to

47

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

stockholders which were contained in the 2016 and 2017 Proxy Statements. The 2016 and 2017 Proxy Statements contained proposals, *inter alia*, to Endologix's stockholders urging stockholders to re-elect certain directors to the Board and approve the compensation of the Company's executive officers. The 2016 and 2017 Proxy Statements, however, misstated or failed to disclose: (i) the Company's inadequate internal and disclosure controls; (ii) the Company's reporting failures concerning the performance of the Nellix EVAS System, the migration problems that plagued the device, and the Company's inability to obtain PMA for the device; (iii) the Board-approved compensation programs that encouraged the non-disclosure and inadequate reporting of material information; and (iv) that the Nellix EVAS System was not on track for FDA approval due to the severe, longstanding problems with migration.

144.  By reasons of the conduct alleged herein, the Director Defendants violated Section 14(a) of the Exchange Act. As a direct and proximate result of the Director Defendants' wrongful conduct, Endologix misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Endologix's recommendation to re-elect certain directors to the Board and approve certain executive compensation.

145.  The misleading information contained in the 2016 and 2017 Proxy Statements was material to Endologix's stockholders in determining whether to elect certain directors to the Board and approve certain executive compensation. This information was also material to the integrity of those directors that were proposed for election to the Board.

146.  Plaintiff, on behalf of Endologix, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy Statements.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duties

147.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.   The Individual Defendants owed, and owe, fiduciary obligations to Endologix.  By reason of their fiduciary relationships, the Individual Defendants owed, and owe, Endologix the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

149.   Based on the misconduct alleged herein, the Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

150.   The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

151.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Endologix has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

152.   Plaintiff, on behalf of Endologix, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

153.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense, and to the detriment, of Endologix.

49

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

155.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Endologix.

156.   Plaintiff, as a shareholder and representative of Endologix, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

157.   Plaintiff, on behalf of Endologix, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

158.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and on-going harm to the Company.

160.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) by paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

161.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

162.   Plaintiff, on behalf of Endologix, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

A.      Against all Defendants for the amount of damages sustained by the Company as a result of Defendants' violations of federal law, breaches of fiduciary duties, unjust enrichment and waste of corporate assets;

B.      Directing Endologix to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect Endologix and its shareholders from a repeat of the damaging events described herein, including but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to appropriately test and strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to proposal to de-classify the Company's Board and calling for each director to stand for election to the Board annually;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Endologix's directors, executives, and other employees;

- a provision to permit the shareholders of Endologix to nominate at least three candidates for election to the Board to replace existing directors; and

- a proposal to strengthen the Company's oversight and controls over insiders' purchase and sale of Company stock;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

C.     Awarding to Endologix restitution from the Individual Defendants and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully Submitted,

Dated: July 12, 2017

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
PHONG L. TRAN

By: */s/ Frank J. Johnson*

FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
frankj@johnsonandweaver.com
phongt@johnsonandweaver.com

*Counsel for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
Case No.: 8:17-cv-01183

# **VERIFICATION**

I, Nick Cocco, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated: July 7, 2017

_____

(Signature of Nick Cocco)